BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Joachim B. Steinberg (State Bar No. 298066)
  jsteinberg@bgrfirm.com
George B. A. Laiolo
  glaiolo@bgrfirm.com
44 Montgomery Street, Suite 1280
San Francisco, California 94104
Telephone: (415) 391-7100
Facsimile:  (415) 391-7198

KIRTON McCONKIE
James T. Burton (Utah Bar No. 11875)*
  jburton@kmclaw.com
Joshua S. Rupp (Utah Bar No. 12647)*
  jrupp@kmclaw.com
Key Bank Tower
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: 801-328-3600
Facsimile: 801-321-4893
*Pro hac vice applications forthcoming

Attorneys for Plaintiffs
Aqua Dam, Inc. and Water Structures Unlimited, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AQUA DAM, INC., a California corporation; and WATER STRUCTURES UNLIMITED, LLC, a California limited liability company,<br><br>                 Plaintiffs,<br><br>        vs.<br><br>AQUADAM EUROPE LIMITED f/k/a ALBION WATER STRUCTURES, LIMITED, an English corporation; GREGORY M. SHAKESHAFT, an individual; and DOES 1-10, inclusive,<br><br>                 Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY AND INJUNCTIVE RELIEF;**<br>2. **BREACH OF CONTRACT;**<br>3. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>4. **TRADEMARK INFRINGEMENT;**<br>5. **FALSE ADVERTISING / FALSE DESIGNATION OF ORIGIN;**<br>6. **UNFAIR COMPETITION;**<br>7. **TORTIOUS INTERFERENCE;**<br>8. **UNJUST ENRICHMENT;**<br>9. **FRUADULENT INDUCEMENT / NEGLIGENT MISREPRESENTATION;**<br>10. **PROMISORY ESTOPPEL; AND**<br>11. **CIVIL EXTORTION.**<br><br>**DEMAND FOR JURY TRIAL** |

1783976.1

Plaintiffs Aqua Dam, Inc. ("ADI") (formerly known as David Doolaege d/b/a Water Structures Unlimited) and Water Structures Unlimited, LLC ("WSU") (collectively, "Plaintiffs" or "Aqua Dam") bring this action against Defendants AquaDam Europe Limited f/k/a Albion Water Structures, Limited (collectively, "ADE"), Gregory M. Shakeshaft ("Shakeshaft"), and Does 1 through 10 (collectively, "Defendants" unless otherwise specified). Aqua Dam alleges facts regarding itself based on personal knowledge and makes all other allegations below based on information and belief after an investigation by Plaintiffs and undersigned counsel, and complain and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking, *inter alia*, declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202 to resolve an actual case or controversy between Aqua Dam and Defendants regarding a former and now terminated contractual and/or business relationship therebetween.

2.     This action further seeks relief for breach of contract, breach of the implied covenant of good faith and fair dealing, trademark infringement, false advertising / false designation of origin, unfair competition, tortious interference with existing or prospective economic relations, unjust enrichment, fraudulent inducement and/or negligent misrepresentation, promissory estoppel and civil extortion.

3.     Aqua Dam seeks damages, a permanent injunction and hereby demands a trial by jury on all claims and issues so triable.

## PARTIES

4.     Plaintiff Aqua Dam, Inc. or ADI is a California corporation with its principal place of business located at 121 Main Street, Scotia, California.

5.     Plaintiff Water Structures Unlimited, LLC or WSU is a California limited liability company with its principal place of business located at 121 Main Street, Scotia, California. ADI and WSU, collectively Aqua Dam, are commonly owned and controlled.

6.     Upon information and belief, Defendant AquaDam Europe Limited or ADI, formerly known as Albion Water Structures, Limited ("AWS"), is an English corporation with its

principal place of business located at Windmill Hill Business Park, Whitehill Way, Swindon, England.

7.      Upon information and belief, Defendant Gregory M. Shakeshaft is an individual residing in England.

8.      Doe Defendants 1-10, inclusive whether individuals, corporations, associations, partnerships or otherwise, are fictitious names of defendants whose true names are, at this time, unknown to Aqua Dam.  Aqua Dam is informed and believes, and thereon alleges, that each of said fictitiously named defendants contributed to the damages herein alleged and Aqua Dam will name such defendants when their identity has been ascertained in accordance with California Code of Civil Procedure § 474.  Further, Aqua Dam alleges that the Doe Defendants in this action committed the same or similar acts alleged as the named defendants in this claim for relief; therefore, all acts alleged to have been committed by the named defendants are also alleged to have been committed by the Doe Defendants.

9.      Upon information and belief, at all times relevant hereto, each of the Defendants were the agents, joint venturers and/or employees of each of the remaining Defendants and in doing the things hereinafter alleged, each was acting within the course and scope of said agency, employment and/or joint venture with the advance knowledge, acquiescence or subsequent ratification of each and every remaining Defendant.

10.     Upon information and belief, Defendants aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

**JURISDICTION AND VENUE**

11.     This is an action for declaratory and injunctive relief as well as, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, trademark infringement,

unfair competition, false advertising, and false designation of origin under the Lanham Act (a.k.a. Trademark Act of 1946, 15 U.S.C. §§ 1051-1127, as amended), common law trademark infringement, unfair competition, tortious interference, unjust enrichment, fraudulent inducement, negligent misrepresentation, promissory estoppel, and civil extortion and unfair competition under California Business and Professions Code § 17200 *et seq*.

12.     This Court has subject matter jurisdiction over this action under at least 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338(a)-(b) (trademarks), 15 U.S.C. § 1121 (trademarks) and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

13.     This Court also has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(a) inasmuch as the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court further has supplemental or pendant jurisdiction over Aqua Dam's state law and/or common law claims under 28 U.S.C. § 1367(a) inasmuch as those claim arise from a common nucleus of operative facts alleged in Aqua Dam's federal claims and form part of the same case or controversy as the federal question claims under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over all Defendants under either specific or general jurisdiction as each has sufficient contacts with California and has consented through contractual agreement to *in personam* jurisdiction and venue in this Court.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and/or (3) inasmuch as a substantial part of the events or omissions giving rise to Aqua Dam's claims occurred here, Defendants are subject to the Court's personal jurisdiction with respect to this action, and by contract the parties agreed that venue is proper in this judicial district.

## GENERAL ALLEGATIONS

*Aqua Dam's Intellectual Property Rights, Including Rights in the Distinctive AQUA DAM Trademark*

17.     Aqua Dam's predecessors in interest began doing business in 1988, adopting the distinct and source identifying tradename "Aqua Dam" in 1992.

18.     Aqua Dam designs, manufactures and sells high quality barriers for stream diversion and flood control which consist of specially designed and carefully constructed polyethylene tubes or bladders which, when filled with water, can be used as temporary barriers (the "Aqua Dam Products" or "Products").[1]

19.     Since at least 1992, Aqua Dam (or its predecessors in interest) have been doing business throughout the United States and the world in connection with the AQUA DAM trademark (United States Trademark Registration No. 3,685,248, the "AQUA DAM Mark" or "Mark"), including in at least the United States, Canada, Australia and Great Britain.  Since that time, Aqua Dam has also engaged others to distribute genuine Aqua Dam's Products under the AQUA DAM Mark throughout the European Union as well as the United Kingdom and elsewhere.

20.     Aqua Dam's long-tenured efforts and accomplishments have contributed to an extraordinary reputation and goodwill throughout the United States and the world, making Aqua Dam a well-known and recognized leader in its industry (an niche global industry in which Aqua Dam is one of the most prominent and recognized historical participants).

21.     To this end, and based on first use dating back to 1992, the AQUA DAM Mark was registered with the United States Patent and Trademark Office on September 22, 2009 in relation to various Aqua Dam Products, including devices for water control, namely, polyethylene tubes for constructing temporary water control barriers for such purposes as stream diversion and flood control.  Plaintiffs also enjoy common law trademark rights throughout the United States and the world in the AQUA DAM Mark in connection with all such Products, with such rights extending back to at least 1992.

22.     The AQUA DAM Mark has been maintained and in continuous use in connection with the Aqua Dam Products throughout the United States and the world ever since that time, and all rights, title, and interest in and to the Mark have been and are currently assigned to WSU.

---

[1] Aqua Dam's Products consist of spiralized, temporary water filed coffer dams or barriers designed to protect against large scale flooding or provide large scale water control, often suited to specific circumstances rather than being off-the-shelf products which can be acquired from ordinary retail establishments.

23.     Aqua Dam's various Products have been widely advertised and extensively promoted under the AQUA DAM Mark (including online through at least www.aquadam.net), and the AQUA DAM Mark has become, through widespread and favorable acceptance and recognition throughout the relevant industry, an asset of substantial value as a symbol of Plaintiffs' exceedingly high quality Products, and Plaintiffs' goodwill.

24.     Aqua Dam has made great expenditures and investments to achieve the success it now enjoys and, owing to such investments over many years, the AQUA DAM Mark has become synonymous with Plaintiffs and the quality of Plaintiffs' Products as well as a source identifier for Plaintiffs' Products.

25.     More specifically, the AQUA DAM Mark has been extensively and continuously advertised and promoted to the relevant consuming public through various means and modes including, but not limited to, over the Internet, at trade shows, telephonically, through distributors, in person, through print publications, through third-party reviews and publications, through news articles, and so forth.  By reason of such advertising and promotion, many customers throughout the United States and the world are familiar with Aqua Dam, familiar with Aqua Dam Products sold under the AQUA DAM Mark, and have come to recognize Plaintiffs' Products as solely originating or emanating from Aqua Dam.

26.     As a result of Plaintiffs' extensive use, advertising, promotion, market recognition, commercial success, and widespread distribution through various retail channels, Plaintiffs' AQUA DAM Mark has become famous and highly distinctive and respected in Aqua Dam's industry.

27.     In connection with promoting its various Products throughout the United States and the world, Aqua Dam has taken numerous photographs of its Products in various stages of use and deployment (the "Photographic Works").  Aqua Dam is the owner of all rights, title and interest, including copyright rights, in and to such Photographic Works, all of which have been used to promote and advertise Aqua Dam's Products at various times throughout Aqua Dam's existence. The Photographic Works are original works of art.

*Aqua Dam's Former Contractual and Business Relationship with ADE, Shakeshaft and Ian Rees*

28.     As mentioned above, starting in approximately 1992, David Doolaege sought to, and did, sell various Products, as well as search for and engage others to distribute Products, primarily under an initial "WATER STRUCTURES" trademark throughout the European Union as well as the United Kingdom.

29.     One such distributor relationship informally began circa 2000-2001 between David Doolaege, on the one hand, and Ian Rees ("Rees"), on the other hand, with Rees personally distributing Products on behalf of David Doolaege.

30.     Specifically, while the relationship began informally, starting in the 2000-2001 timeframe, Rees began acting as a distributor of David Doolaege in the United Kingdom, with the parties' mutual hope that distribution through Rees would expand David Doolaege's global Product distribution and global recognition of the Aqua Dam Products and brand throughout the relevant industry in connection therewith.

31.     On information and belief, circa 2009, Rees created Albion Water Structures, Limited or AWS, a company specifically established for the primary and/or sole purpose of distributing Aqua Dam Products in the United Kingdom as well as the European Union.  Initially, Rees was the Managing Director of AWS.

32.     Around the same time, while David Doolaege had long been using the AQUA DAM Mark (since approximately 1992), in late 2009 or early 2010, Aqua Dam began using the AQUA DAM Mark preferentially to the WATER STRUCTURES mark.  As Aqua Dam's distributor in the United Kingdom and the European Union, AWS also began using the AQUA DAM Mark preferentially to the WATER STRUCTURES mark during that same time period.

33.     On information and belief, AWS and Rees knew about Aqua Dam's rights in the AQUA DAM Mark and the early value of the AQUA DAM Mark in the relevant industry. Moreover, on information and belief, AWS and Rees knew and understood that AWS and Rees were only permitted to utilize the AQUA DAM Mark for purposes of distributing genuine Aqua Dam Products in the United Kingdom and/or (eventually) the European Union subject to Aqua

Dam's oversight and control, with all goodwill and recognition therein accruing to Aqua Dam's benefit, and without AWS and/or Rees obtaining any independent rights or interests in the AQUA DAM Mark apart from AWS and Rees' distributor relationship with Aqua Dam.  In other words, at all relevant times, AWS and Rees were acting as agents for and on behalf of Aqua Dam in order to distribute Aqua Dam's Products under the AQUA DAM Mark throughout the United Kingdom and the European Union, holding any rights, interests, goodwill, or other benefits accruing from such distribution in trust for and on behalf of Aqua Dam.

34.     In early 2012, Shakeshaft replaced Rees as the Managing Director of AWS; however, on information and belief, Rees' role as a primary decision maker on behalf of AWS continued through and including at least February 2013 and may have extended into late 2015.

35.     As the relationship between Aqua Dam and AWS grew over time, it became prudent to formalize the distributor relationship between Aqua Dam, AWS, Rees and Shakeshaft, including for purposes of, *inter alia*, documenting AWS as Aqua Dam's exclusive distributor in the European Union as well as the United Kingdom (a relationship which was already in place but never previously documented), documenting the parties' respective rights and obligations, and documenting the parties' then existing informal relationship and historical course of dealing.

36.     To that end, in or around September, 2012, the parties began discussing and negotiating a formal distribution agreement, with an initial draft circulated among representatives of Aqua Dam (David Doolaege and Matthew Wennerholm) and AWS (Shakeshaft and Rees) on or about September 18, 2012 followed by ongoing negotiations among the parties thereafter.  At all relevant times, Aqua Dam understood that Shakeshaft was merely acting on behalf of AWS subject to Rees' control and direction, not as an independent decision maker.

37.     During the course of the parties' negotiations, and in accordance with the parties' historical course of dealing, at least one proposed draft of the contemplated formal distribution agreement included the following provision entitled "Right to Use Name":

Section 3.03.  The Distributor [(AWS)] may use the name Aqua Dam as applied to Company [(Aqua Dam)] Products in any sign or advertising during the Term of this Agreement.  In the event of termination of this Agreement, or upon request of the Company, Distributor shall discontinue use of such name in any sign or advertising and thereafter shall not use the name directly or indirectly in connection with Distributor's business, nor use any other

name, title or expression so nearly resembling it as would be likely to lead to confusion or uncertainty or to deceive the public.

38.    Nevertheless, on January 29, 2013, after months of negotiations, AWS (via Shakeshaft, and following Rees' purported review) suggested to Aqua Dam, for the very first time, that AWS and/or Shakeshaft, without Aqua Dam's prior knowledge, awareness, consent or approval, had applied or would be applying to register a logo previously utilized by Aqua Dam and incorporating the AQUA DAM Mark (reproduced below) in (a) the United Kingdom (Reg. Nos. UK00002561227, filed October 12, 2010, and UK00909825605, filed March 21, 2011) and (b) the European Union (Reg. No. 009825605, filed March 21, 2011), with purported rights in all current and future member states of the European Union (collectively, the "Initial Unauthorized Registrations").[2]



39.    Aqua Dam has utilized the AQUA DAM Mark as well as the associated logo shown above (the "AQUA DAM Logo") within and throughout the United States since at least 2004; as such, Aqua Dam has acquired significant common law rights and good will in the AQUA DAM Logo in addition to Aqua Dam's common law and federally registered rights in the AQUA DAM Mark discussed above.

40.    Notably, the Initial Unauthorized Registrations recite goods identical to Aqua Dam's Products, namely water inflated liquid barriers for flood protection, water flow diversion, the confinement of water, and the like (which Products are also patented in the United States and elsewhere).

41.    Revealing the Initial Unauthorized Registrations or AWS' intent to obtain the same

---

[2] Aqua Dam anticipates that discovery in this matter will reveal the full extent to which Rees did or did not know about, direct, oversee and/or approve of AWS and/or Shakeshaft's filing for and/or registration of the Initial Unauthorized Registrations.

to Aqua Dam for the first time some twenty-seven (27) months after AWS and/or Shakeshaft (potentially at Rees' direction) had apparently already filed the first thereof, AWS orally represented that it had done so, without Aqua Dam's prior knowledge, awareness, consent or approval, in order to protect Aqua Dam from would-be trademark infringers in the United Kingdom and the European Union in connection with AWS's distribution of Aqua Dam's Products under the existing AQUA DAM Mark.

42. On information and belief, this representation – that AWS and/or Shakeshaft filed the Initial Unauthorized Registrations for Aqua Dam's benefit – was inaccurate or false at the time it was made, Defendants knew or had reason to know that the representation was inaccurate or false at the time it was made and/or Defendants acted negligently and with reckless indifference to Aqua Dam's rights and interests in making the inaccurate or false representation, upon which Aqua Dam relied to it detriment.

43. Under the guise that AWS and/or Shakeshaft, potentially under the direction of Rees, had filed the Initial Unauthorized Registrations without Aqua Dam's prior knowledge, awareness, consent or approval in order to protect Aqua Dam's rights and interests, AWS requested that the above-referenced "Right to Use Name" provision of the draft distribution agreement be removed inasmuch as, in accordance with the parties historical course of dealing and akin to prototypical distribution relationships, AWS was acting as Aqua Dam's agent, merely holding the Initial Unauthorized Registrations in trust for Aqua Dam's benefit, with all goodwill and recognition therein accruing to Aqua Dam during the period of the parties comprehensive distributor relationship.

44. On information and belief, this representation – that AWS and/or Shakeshaft filed the Initial Unauthorized Registrations and were holding them in trust for and on behalf of Aqua Dam – was also inaccurate or false at the time it was made, Defendants knew or had reason to know that the representation was inaccurate or false at the time it was made and/or Defendants acted negligently and with reckless indifference to Aqua Dam's rights and interest in making the inaccurate or false representation, upon which Aqua Dam relied to it detriment.

45. Having only just learned of Defendants' Initial Unauthorized Registrations years

1   after-the-fact, and solely in reliance on Defendants' representations as to the reasons for filing and

2   obtaining the Initial Unauthorized Registrations and that the same were being held in trust for Aqua

3   Dam's benefit, Aqua Dam agreed to removal of the above-referenced "Right to Use Name"

4   provision of the draft distribution agreement on the understanding that the same was unnecessary

5   where Defendants were acting as Aqua Dam's agent and holding all rights and interests in and to

6   the AQUA DAM name and Mark in trust for Aqua Dam's benefit.

7       46.    The parties subsequently executed a Distributor Agreement Between Aqua Dam,

8   Inc. and Albion Water Structures, Limited (the "Agreement"), effective as of February 4, 2013.  (A

9   copy of the Agreement is attached hereto as **Exhibit "A"**).

10      47.    Among other provisions, the Agreement includes at least the following material

11  terms:

    a.   Section 1.04.  The purpose of this Agreement is to appoint an overseas distributor for certain of the Company's [(Aqua Dam's)] Products ("Products").  It is agreed by both parties that a primary business objective of this Agreement is to develop a network of established business people as Products representatives in each of the territory countries where this is a commercially feasible and profitable proposition.

    b.   Section 2.01.  The Company [(Aqua Dam)] appoints the Distributor [(AWS)] as its exclusive distributor with authority to sell, either wholesale or retail, certain of the Company's [P]roducts (specifically, Aqua Dam's), in [various] European Union countries … (collectively, the "Territory").

    c.   Section 2.02.  In consideration of this appointment, the Distributor shall exert its best efforts to promote the sale of the Products.

    d.   Section 2.03.  The Distributor shall not manufacture goods which compete with the Products; actively advertise or solicit orders, establish branches or maintain distribution facilities for the Products outside the Territory; purchase or otherwise acquire the Products for resale from any person, firm or company other than the Company.  However, with prior written agreement from the Company the Distributor may solicit orders outside the Territory.

    e.   Section 2.04.  The Company shall not appoint any other person, firm or company as a distributor for the Products, within the Territory, during the Term of this Agreement, as hereinafter defined; or supply the Products, whether for use or resale, to any person, firm or company in the Territory, other than the Distributor, for the duration of the Term of this Agreement, and further agrees to refer to the Distributor all requests received by the Company from existing or potential customers within the Territory relating to the supply of the Products within the Territory during the Term of this Agreement.

    f.   Section 2.07.  The Distributor accepts the appointment to development [sic]

demand and to sell the Products within the Territory and will make all sales hereunder in accordance with the terms of this Agreement.

g.  Section 2.08. … (8.2) On an annual basis, the Company shall evaluate the success of Distributor's efforts to organize a network of physical distribution locations within the Territory (to receive, store and distribute the Products within the Territory), as well as all other aspects of the performance of the Distributor with respect to the subject matter of this Agreement.  Such evaluation and all determinations following same shall be in the Company's sole and absolute discretion.  In the event the Company determines that the Distributor's performance is not satisfactory to the Company, the Company shall provide the Distributor with one hundred eighty (180) days' written notice, sent by registered mail to Distributor at the address set out above, with such notice to be complete upon mailing, providing a specific description of the unsatisfactory performance and a specific description of those actions necessary to cure the unsatisfactory performance.  In the event that the unsatisfactory performance, in the sole and absolute discretion of the Company, is not cured within said one hundred eighty (180) days, the Company shall have the option, in the Company's sole and absolute discretion, to terminate the Agreement without further notice.

h.  Section 2.08. … (8.3)  Either party may terminate this Agreement by giving ninety (90) days written notice sent by registered mail to the other at the address set out above, with such notice to be complete upon mailing, for any of the following reasons:  a.  If any sum owing to that party by the other party under any of the provisions of this Agreement is not paid within one hundred twenty (120) days of the due date for payment;  b.  If the other party commits any other breach of any of the provisions of this Agreement and, if the breach is capable of being cured, fails to cure the breach within one hundred eighty (180) days' after being given written notice providing a specific description of the breach and a specific description of those actions necessary to cure said breach….

i.  Section 4.06.   The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the State of California, U.S.A.  It is understood, however, that this is a general form of agreement, designated for use between the Company, who is headquartered in the United States of America, and Distributor, who is headquartered in the United Kingdom.  The parties agree that any and all disputes that may arise concerning the subject matter of this Agreement, that are not otherwise resolved without litigation, shall be litigated in the State Courts of the State of California, with venue in the County of Humboldt, and/or in the United States District Court, Northern District of California.

48.   On information and belief, following execution of the Agreement, AWS became ADE, with ADE assuming all rights and obligations under the Agreement.

49.   At all relevant times, ADE / AWS's rights under the Agreement (as well as the parties' pre-Agreement relationship and course of dealing) were limited to those of an authorized distributor or agent only; at no point has ADE / AWS acquired or otherwise been assigned or licensed any rights, including intellectual property rights, in Aqua Dam's Products and/or the

AQUA DAM Mark or Logo outside of the Agreement or the parties' pre-Agreement relationship and course of dealing.

50.    Notwithstanding the express terms of the Agreement, as well as the covenant of good faith and fair dealing implied therein, ADE and/or AWS have breached the Agreement without cure in at least the following respects: (a) ADE / AWS have failed to pay Aqua Adam monies due and owing within one hundred twenty (120) days of the due date for payment, including at least (i) $77,621.20 USD invoiced per the Agreement and (ii) approximately $250,000.00 USD for Aqua Dam Products removed from a container provided to ADE / AWS which ADE / AWS have never accounted or paid for; (b) as determined in Aqua Dam's  sole and absolute discretion as provided for under the Agreement, ADE / AWS have failed to utilize their "best efforts to promote the sale of [Aqua Dam's] Products" within the Territory inasmuch as ADE / AWS have instead marketed and sold competing goods under the brands "Speedy Dam" and/or "Speedy Flood" (collectively, the "Speedy Dam" brand or marks), including seeking to obtain intellectual property rights therein belonging to WSU or otherwise creating a likelihood of confusion relative to the AQUA DAM Mark or Logo;[3] (c) in contravention of the Agreement, and without Aqua Dam's prior written consent, ADE / AWS have manufactured, advertised, solicited orders for, and/or sold goods which compete with Aqua Dam's Products within the Territory, namely ADE / AWS's Speedy Dam / Speedy Flood goods (collectively, the "Speedy Dam" goods); (d) in contravention of the express or implied terms of the Agreement, ADE / AWS has (i) improperly claimed independent rights in the AQUA DAM Mark and Logo, (ii) refused to transfer and assign any such rights, including the goodwill associated therewith and accruing to Aqua Dam's benefit, to Aqua Dam, (iii) applied to register or registered additional Aqua Dam marks without Aqua Dam's prior knowledge, awareness, consent or approval (the "Additional Unauthorized Registrations," including at least Reg. No. UK00916797813, filed June 4, 2017 in the United Kingdom, and Reg. No. 016797813,

---

[3] While Aqua Dam anticipates that discovery will reveal the full extent of ADE / AWS' efforts to market and sell goods under the Speedy Dam brand, Aqua Dam alleges on information and belief that ADE / AWS' concurrent use of the AQUA DAM Mark and Logo alongside the Speedy Dam brand or marks has created an affiliation in the minds of consumers between Aqua Dam and the AQUA DAM Mark and Logo, on the one hand, and ADE / AWS and the Speedy Dam brand or marks, on the other hand.

filed June 4, 2017 in the European Union), (iv) has  applied to register or registered competing Speedy Dam marks which are confusingly similar to Aqua Dam's AQUA DAM Mark and Logo, and (v) improperly utilized ADE / AWS's Initial and Additional Unauthorized Registrations to oppose or otherwise contest (or threaten to oppose or otherwise contest) Aqua Dam's trademark rights in the United Kingdom and the European Union on the basis that Aqua Dam's AQUA DAM Mark and Logo are allegedly likely to cause consumer confusion vis-à-vis ADE / AWS's limited use of Aqua Dam's AQUA DAM Mark and Logo under the Agreement; (e) refusing to acknowledge or comply with Aqua Dam's termination of the Agreement; (f) threatening to utilize procedures and judicial or quasi-judicial bodies in either the United Kingdom and the European Union to resolve disputes among the parties; (g) seeking to extort unbargained for consideration from Aqua Dam through the foregoing; and (h) seeking to register or otherwise obtain intellectual property rights belonging to Aqua Dam.

51.     In view of the foregoing, and pursuant to the terms of the Agreement, on October 25, 2019, Aqua Dam provided ADE / AWS with written notice, sent by registered mail, of automatic termination of the Agreement ninety (90) days thereafter.

52.     To the extent curable, ADE / AWS has not cured or attempted to cure any of the breaches of contract specifically identified on October 25, 2019 or above.

53.     As such, the Agreement terminated according to its express terms on January 23, 2020.

54.     Notwithstanding termination of the Agreement, and Aqua Dam's demands that (a) ADE / AWS cease using Aqua Dam's AQUA DAM Mark and Logo, (b) transfer or assign all rights and interests in and to the same held in trust for Aqua Dam in the United Kingdom and the European Union to Aqua Dam, and (c) pay all outstanding amounts due under the Agreement, Defendants have refused to do so and, instead, continue to improperly utilize Aqua Dam's AQUA DAM Mark and Logo to compete with Aqua Dam throughout the world, including but not limited to selling competing goods under ADE / AWS's Speedy Dam brand which is confusingly similar to Aqua Dam's AQUA DAM Mark and Logo.  On informant and belief, Aqua Dam is aware of at least two or three customers who either (a) may have purchased unauthorized goods from ADE under the

mistaken assumption that the goods were legitimate Products originating with Aqua Dam and/or (b) were actually confused as to the source of goods (receiving Aqua Dam goods believing ADE to be the source or vice versa) as a result of ADE's conduct complained of herein.

55.    Worse, Defendants have relied and continued to rely on that same conduct to extort unbargained for consideration from Aqua Dam.

56.    Moreover, in connection with promoting ADE / AWS's competing Speedy Dam goods, particularly after termination of the Agreement, Defendants have used and/or continue to use Aqua Dam's Photographic Works, including at https://www.aquadam-europe.com as well as social media, without Aqua Dam's authorization or consent and in contravention of Aqua Dam's copyright rights therein.

57.    At the same time, in an effort to further its extortionate efforts, Defendants have accused Aqua Dam of (a) breaching the parties' Agreement, (b) infringing copyrights in certain "manuals" allegedly created by ADE / AWS and (c) infringing alleged trademark rights Defendants assert in Aqua Dam's AQUA DAM Mark and Logo, which allegations Aqua Dam denies.

58.    Further to the foregoing, on information and belief, ADE / AWS's conduct complained of herein constitutes infringement of Aqua Dam's AQUA DAM Mark and Logo in a way that affects American foreign commerce inasmuch as at least (a) ADE / AWS utilize the website https://aquadam-europe.com/, along with other online social media platforms (all of which are available within the United States and throughout the world), to market, advertise, and sell ADE / AWS's goods (including the competing Speedy Dam goods), (b) ADE / AWS entered into the Agreement (following prior dealings) with Aqua Dam, knowing Aqua Dam was based in the United States and that the Aqua Dam Products ADE / AWS were distributing were manufactured and distributed within, from, or through the United States at all relevant times, (c) ADE / AWS's conduct seeks to create unfair competition or even preclude Aqua Dam (a company based in California) from continuing to operate in and/or expand into various foreign countries under Aqua Dam's AQUA DAM Mark and Logo, including foreign countries Aqua Dam has been operating in since 1992, (d) diverting existing and potential customers within the United States and abroad from Aqua Dam to ADE / AWS resulting in potential and existing lost sales and prospective business

opportunities in the United States and elsewhere, (e) decreasing or devaluing Aqua Dam's AQUA DAM Mark, Logo and reputation by, among other things, selling competing but inferior goods while continuing to improperly utilize the AQUA DAM Mark and Logo in contravention of the Agreement, (f) selling competing goods which may ultimately flow into American domestic markets once placed in the stream of commerce, (g) ADE / AWS's conduct implies a false endorsement or affiliation with Aqua Dam both within the United States and in foreign markets in which Aqua Dam operates, and so forth.

59.     In view of the foregoing, on information and belief, ADE / AWS's conduct is causing or will likely cause Aqua Dam to sustain damages and other injuries within the United States, including, but not limited to, lost sales from the United States, limits on expansion and distribution of Products from the United States, diversion of existing or potential customers within the United States and elsewhere, devaluation of Aqua Dam's intellectual property and reputation within the Unites States and abroad, and misleading consumers both within the United States and abroad.

60.     Moreover, on information and belief, where Aqua Dam's rights in the AQUA DAM Mark and/or Logo date back to at least 1992, the interests of and links to America foreign commerce described above are sufficiently strong to justify extraterritorial application of the Lanham Act inasmuch as, *inter alia*, (a) Aqua Dam is based in the United States with a principal place of business in Scotia, California, (b) this Court can enforce injunctive relief against ADE / AWS's domestic and foreign conduct, (c) extraterritorial application of the Lanham Act will protect both Aqua Dam's rights in the AQUA DAM Mark and Logo as well as protecting consumers from confusion both within the United States and abroad, (d) ADE / AWS's continued and unauthorized use of the AQUA DAM Mark and Logo is intended to harm Aqua Dam and such harm is foreseeable under the circumstances, and (e) given the niche global market in which Aqua Dam operates, ADE / AWS's foreign and domestic conduct is likely to have at least as significant of an effect on American commerce in the relevant industry as it will have on foreign commerce where the market for Aqua Dam's Products is global.

**CAUSES OF ACTION**

**COUNT I**

**(Declaratory & Injunctive Relief – As To All Defendants)**

61.     Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

62.     At this time, and under 28 U.S.C. §§ 2201 and 2202, a clear and actual controversy exists between the parties regarding at least (a) whether ADE / AWS has committed and remains without cure in breach of the express terms and/or covenants of good faith and fair dealing implied in the Agreement as alleged by Aqua Dam, (b) whether the Agreement has been properly terminated, thus curtailing certain rights, if any, of ADE / AWS and/or its principals acquired under the Agreement as disputed by Defendants, (c) whether Defendants acquired any independent rights in and to Aqua Dam's AQUA DAM Mark and Logo, or Aqua Dam's other intellectual property, in connection with the parties' course of dealing, historical relationship and/or the Agreement as denied by Aqua Dam, (d) whether Defendants' rights, if any, in Aqua Dam's AQUA DAM Mark and Logo, or Aqua Dam's other intellectual property, survive termination of the Agreement as denied by Aqua Dam, (e) whether Aqua Dam is infringing any copyright rights Defendants assert in certain manuals allegedly created by ADE / AWS and/or any trademark rights Defendants assert in Aqua Dam's AQUA DAM Mark and Logo, which Aqua Dam denies, (f) whether Defendants have the right to utilize procedures and judicial or quasi-judicial bodies in either the United Kingdom and the European Union to resolve disputes among the parties in contravention of the terms of the Agreement, which Aqua Dam disputes, (g) whether Aqua Dam is in breach of the parties' Agreement, and so forth.

63.     Where Aqua Dam is being damaged and suffering irreparable injury in the form of harm to Aqua Dam's reputation and brand, among other harms, no adequate remedy exists at law.

64.     Consequently, a judicial declaration is necessary in order to determine the rights and responsibilities of the parties with respect to, *inter alia*, the Agreement and the parties' pre-Agreement course of dealing.

65.     Moreover, Aqua Dam seeks and is entitled to injunctive relief to (a) prevent

1 Defendants from continuing to infringe on Aqua Dam's intellectual property rights, including at

2 least Aqua Dam's rights in the AQUA DAM Mark and Logo and (b) compel Defendants to assign

3 the Initial and Additional Unauthorized Registrations to Aqua Dam.

4         66.    Aqua Dam requests that the Court enter a judgment declaring the parties' right and

5 responsibilities under the Agreement, finding ADE / AWS in breach of the Agreement, finding

6 Aqua Dam in compliance with the Agreement, finding that the Agreement has been properly

7 terminated, enjoining Defendants from the conduct complained of herein, holding Defendants liable

8 for the damages Aqua Dam has suffered as a consequence of Defendants' conduct, holding that

9 Aqua Dam is not infringing on any copyright or trademark rights belonging to Defendants and

10 compelling Defendants to assign the Initial and Additional Unauthorized Registrations to Aqua

11 Dam.

12                                          **COUNT II**

13                             **(Breach of Contract – As To ADE)**

14         67.    Aqua Dam restates and incorporates by reference each of the allegations set forth in

15 the paragraphs above, as if fully set forth herein.

16         68.    For good and valuable consideration, ADE (via its predecessor AWS) and ADI

17 entered into the Agreement on February 4, 2013, which is a valid and binding contract.

18         69.    At all relevant times, ADI has performed all conditions and covenants required to

19 be performed pursuant to the Agreement, save and except those excused by the acts or omissions

20 of ADE.

21         70.    ADE's actions as alleged herein, including at least ADE's failure to timely pay ADI

22 monies due and owing, failure to utilize its "best efforts to promote the sale of [Aqua Dam's]

23 Products," marketing goods which compete with Aqua Dam's Products, attempts to usurp and limit

24 Aqua Dam's rights in the AQUA DAM Mark and Logo, attempts to extort additional unbargained

25 for consideration out of Aqua Dam, and so forth, constitute breaches of ADE's express material

26 contractual obligations under the Agreement.

27         71.    As a direct and proximate result of ADE's breaches of the Agreement, Aqua Dam

28 has and continues to sustain damages in an amount and manner to be determined at trial according

to proof but in no event less than $327,621.20, including actual, consequential, general and special compensatory damages and/or injuries.

72.     Absent injunctive relief, and on information and belief, ADE and Defendants will continue to act in contravention of the Agreement, resulting in further injury to Aqua Dam.

73.     Thus, in addition to an award of damages, Aqua Dam is also entitled to injunctive relief, restraining and enjoining ADE's (and its principals') ongoing breach of the Agreement.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – As To ADE)

74.     Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

75.     For good and valuable consideration, ADE (via its predecessor AWS) and ADI entered into the Agreement on February 4, 2013, which is a valid and binding contract.

76.     An implied covenant of good faith and fair dealing inheres in the parties' Agreement, which implied covenant prevents ADE (and its principals) from acting, or failing to act, in a manner that deprives Aqua Dam of the benefits of the bargain contemplated therein.

77.     At all relevant times, ADI has performed all conditions and covenants required to be performed pursuant to the Agreement, save and except those excused by the acts or omissions of ADE.

78.     ADE's actions as alleged herein, including at least ADE's failure to timely pay ADI monies due and owing, failure to utilize its "best efforts to promote the sale of [Aqua Dam's] Products," marketing goods which compete with Aqua Dam's Products, attempts to usurp and limit Aqua Dam's rights in the AQUA DAM Mark and Logo, attempts to extort additional unbargained for consideration out of Aqua Dam, and so forth, constitute breaches of ADE's contractual obligations implied in the Agreement and have prevented Aqua Dam from realizing all of the benefits of the parties' bargain.

79.     As a direct and proximate result of ADE's breaches of the covenant of good faith and fair dealing implied in the Agreement, Aqua Dam has and continues to sustain damages in an amount and manner to be determined at trial according to proof but in no event less than

$327,621.20, including actual, consequential, general and special compensatory damages and/or injuries.

80.     Absent injunctive relief, and on information and belief, ADE and Defendants will continue to act in contravention of the covenant of good faith and fair dealing implied in the Agreement, resulting in further injury to Aqua Dam.

81.     Thus, in addition to an award of damages, Aqua Dam is also entitled to injunctive relief, restraining and enjoining ADE's (and its principals') ongoing breach of the covenant of good faith and fair dealing implied in the Agreement.

## COUNT IV

### (Statutory and/or Common Law Trademark Infringement – As To All Defendants)

82.     Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

83.     Aqua Dam possesses (a) a valid federal trademark registration (U.S. Trademark Reg. No. 3,685,248) issued by the United States Patent and Trademark Office for the AQUA DAM Mark and (b) extensive common law rights throughout the United States and the world in the AQUA DAM Mark and Logo.  Moreover, Aqua Dam's AQUA DAM Logo is distinctive and has acquired secondary meaning.

84.     Defendants' actions as described herein, including (a) Defendants' ongoing but unauthorized use of Aqua Dam's AQUA DAM Mark and Logo, (b) Defendants' attempts to register and registration of Aqua Dam's AQUA DAM Mark and Logo in the United Kingdom and the European Union without Aqua Dam's knowledge, consent or approval, (c) Defendants ongoing use of the confusingly similar Speedy Dam brand, (d) Defendants' refusal to assign the Initial and Additional Unauthorized Registrations to Aqua Dam and so forth, are likely to cause confusion and/or have caused confusion, or are likely to cause mistake and/or have caused mistake, or are likely to deceive and/or have deceived the relevant consuming public as to an affiliation, connection or association of Defendants with Aqua Dam, or as to the origin, sponsorship or approval of Defendants' competing goods by Aqua Dam.

85.     Such conduct constitutes trademark infringement in violation of Section 32 of the

Lanham Act (15 U.S.C. § 1114) and/or Aqua Dam's common law rights as well as unfair competition.

86.     Defendants' trademark infringement has caused and continues to cause damage and irreparable injury to the value and goodwill of Aqua Dam's AQUA DAM Mark and Logo, as well as damages and irreparable injury to Aqua Dam's business, goodwill and reputation.

87.     Aqua Dam has no adequate remedy at law because damages are continuing and difficult to ascertain.

88.     On information and belief, Defendants' continued use of Aqua Dam's AQUA DAM Mark and Logo is deliberate, willful, fraudulent, and constitutes a knowing infringement of at least Aqua Dam's AQUA DAM Mark, making this case exceptional.

89.     By virtue of the foregoing, Aqua Dam is entitled to an award of treble damages and the costs of the action under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

90.     By virtue of the foregoing, Aqua Dam is entitled to an award of attorneys' fees under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

91.     By virtue of the foregoing, Aqua Dam is entitled to injunctive relief and monetary damages against Defendants.

92.     By virtue of the foregoing, Aqua Dam is entitled to an award of exemplary and/or punitive damages.

## COUNT V

### (False Advertising / False Designation of Origin– As To All Defendants)

93.     Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

94.     Aqua Dam possesses (a) a valid federal trademark registration (U.S. Trademark Reg. No. 3,685,248) issued by the United States Patent and Trademark Office for the AQUA DAM Mark and (b) extensive common law rights throughout the United States and the world in the AQUA DAM Mark and Logo.  Moreover, Aqua Dam's AQUA DAM Logo is distinctive and has acquired secondary meaning.

95.     Defendants' actions as described herein, including (a) Defendants' ongoing but

unauthorized use of Aqua Dam's AQUA DAM Mark and Logo, (b) Defendants' attempts to register and registration of Aqua Dam's AQUA DAM Mark and Logo in the United Kingdom and the European Union without Aqua Dam's knowledge, consent or approval, (c) Defendants ongoing use of the confusingly similar Speedy Dam brand, (d) Defendants' refusal to assign the Initial and Additional Unauthorized Registrations to Aqua Dam and so forth, are likely to cause confusion and/or have caused confusion, are likely to cause mistake and/or have caused mistake, or are likely to deceive and/or have deceived the relevant consuming public as to an affiliation, connection or association of Defendants with Aqua Dam, or as to the origin, sponsorship or approval of Defendants' competing goods by Aqua Dam.

96.     Such conduct constitutes false advertising and false designation of origin in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and/or Aqua Dam's common law rights as well as unfair competition.

97.     Defendants' false advertising and false designation of origin has caused and continues to cause damage and irreparable injury to the value and goodwill of Aqua Dam's AQUA DAM Mark and Logo, as well as damages and irreparable injury to Aqua Dam's business, goodwill and reputation.

98.     Aqua Dam has no adequate remedy at law because damages are continuing and difficult to ascertain.

99.     On information and belief, Defendants' actions as alleged herein are deliberate, willful, fraudulent, and constitute a knowing disregard of Aqua Dam's rights in at least the AQUA DAM Mark, making this case exceptional.

100.    By virtue of the foregoing, Aqua Dam is entitled to an award of treble damages and the costs of the action under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

101.    By virtue of the foregoing, Aqua Dam is entitled to an award of attorneys' fees under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

102.    By virtue of the foregoing, Aqua Dam is entitled to injunctive relief and monetary damages against Defendants.

103.    By virtue of the foregoing, Aqua Dam is entitled to an award of exemplary and/or

1   punitive damages.

2   **COUNT VI**

3   **(Statutory and/or Common Law Unfair Competition – As To All Defendants)**

4        104.    Aqua Dam restates and incorporates by reference each of the allegations set forth in

5   the paragraphs above, as if fully set forth herein.

6        105.    California Business and Professions Code Section 17200 defines Unfair

7   Competition as an "unlawful, unfair or fraudulent business act or practice[.]"

8        106.    Defendants engaged in unlawful and unfair conduct by filing for and obtaining the

9   Initial and Additional Unauthorized Registrations without Aqua Dam's knowledge, approval or

10   consent and then by refusing to transfer and assign the same to Aqua Dam upon conclusion of the

11   parties' business relationship but instead seeking to extort additional unbargained for concessions

12   or consideration out of Aqua Dam in exchange therefore.  Defendants have further engaged in

13   fraudulent conduct by either explicitly or implicitly falsely representing to Aqua Dam that

14   Defendants were merely holding the Initial and Additional Unauthorized Registrations in trust for

15   Aqua Dam's benefit, with all goodwill and recognition therein accruing to Aqua Dam, in order to

16   induce Aqua Dam to enter into the Agreement but then refusing to transfer and assign the Initial

17   and Additional Unauthorized Registrations to Aqua Dam upon conclusion of the parties' business

18   relationship but instead seeking to extort additional unbargained for concessions or consideration

19   out of Aqua Dam in exchange therefore.

20        107.    Upon information and belief, Defendants have continued to market and sell their

21   competing Speedy Dam goods under or in connection with the AQUA DAM Mark and Logo,

22   obtaining the benefit of goodwill and reputation belonging to Aqua Dam, thus gaining an unfair

23   advantage by using the AQUA DAM Mark and Logo without authorization to sell competing goods

24   thereunder.

25        108.    Defendants have gained a commercial benefit by using the AQUA DAM Mark and

26   Logo in violation of Aqua Dam's rights therein.

27        109.    The unlawful, unfair and/or fraudulent conduct of Defendants constitutes "unfair

28   competition" in violation of Cal. Bus. & Prof. Code § 17200 as it is immoral, unethical, oppressive

1   and/or unscrupulous.

2       110.    As a result of the unlawful conduct of Defendants, Aqua Dam is entitled to

3   disgorgement of the benefits obtained by Defendants as a result of their unfair competition,

4   restitution, and temporary and permanent injunctive relief.

5                               **COUNT VII**

6       **(Tortious Interference With Business Relations – As To All Defendants)**

7       111.    Aqua Dam restates and incorporates by reference each of the allegations set forth in

8   the paragraphs above, as if fully set forth herein.

9       112.    Aqua Dam has valid business relationships and expectancies with numerous

10  customers and potential customers throughout the United States and the world, in part due to the

11  distribution of Aqua Dam's Products through authorized distributors and their principals or

12  employees, including but not limited to Defendants.

13      113.    By virtue of previously being a distributor for and on behalf of Aqua Dam,

14  Defendants are intimately familiar with Aqua Dam's valid business relationships and expectancies

15  with various customers and potential customers throughout the United States and the world,

16  including in the United Kingdom and the European Union.

17      114.    On information and belief, by improper means, without authorization, and with the

18  intent to unfairly compete against Aqua Dam, Defendants have intentionally and knowingly

19  interfered with Aqua Dam's valid business relationships and expectancies with various customers

20  and potential customers throughout the United States and the world, including in the United

21  Kingdom and the European Union.

22      115.    As a result of Defendants' tortious interference with Aqua Dam's valid business

23  relationships and expectancies, Aqua Dam has been damaged and suffered irreparable injury.

24      116.    Aqua Dam is entitled to full compensatory and consequential damages for

25  Defendants' tortious interference.

26

27

28

**COUNT VIII**

**(Unjust Enrichment – As To All Defendants)**

117.   Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

118.   Defendants have received numerous benefits as a result of the parties' business relationship, including (a) receiving Aqua Dam Products on consignment and/or at Aqua Dam's cost which Defendants sold at a profit and only paid Aqua Dam for a percentage of what was sold, (b) receiving Aqua Dam Products on consignment and/or at Aqua Dam's cost which Defendants sold but never paid Aqua Dam, (c) having access to Aqua Dam's industry leading Products and extensive research and development underlying the same, (d) limited use of the AQUA DAM Mark, Logo, recognition and brand heretofore, and so forth.

119.   Defendants have knowingly and voluntarily accepted and received the foregoing benefits and are keenly aware of the same.

120.   It would be unjust and inequitable to allow Defendants to retain and enjoy all of the foregoing benefits without compensating Aqua Dam in an amount equal to the fair market value of all such benefits.

121.   Aqua Dam has incurred and will continue to incur monetary damages as a direct and proximate result of the benefits Aqua Dam has bestowed upon the Defendants absent just compensation.

122.   Likewise, Aqua Dam has and will continue to suffer irreparable injury as a direct and proximate result of Defendants' conduct.

123.   Absent equitable relief, Aqua Dam will continue to be damaged, even irreparably so, by Defendants' conduct.

**COUNT IX**

**(Fraudulent Inducement / Negligent Misrepresentations – As To All Defendants)**

124.   Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

125.    Prior to executing the Agreement, Defendants explicitly or implicitly falsely represented that ADE's predecessor, AWS, and/or its principal Shakeshaft, filed for, obtained and were holding at least the Initial Unauthorized Registrations in trust for Aqua Dam's benefit, with all goodwill and recognition therein accruing to Aqua Dam.

126.    Based on that representation, Aqua Dam executed and entered the Agreement.

127.    In fact, at the time such representations were made and continuing down to the present time, Defendants had no intention of holding at least the Initial Unauthorized Registrations in trust for Aqua Dam's benefit, with all goodwill and recognition therein accruing to Aqua Dam. Instead, Defendants filed for and obtained the Initial Unauthorized Registrations, and filed for and obtained the Additional Unauthorized Registrations, solely for Defendants' own benefit and to use the same as leverage over Aqua Dam.

128.    Defendants made the aforementioned representations to Aqua Dam knowing that the representations were false, or made them recklessly without regard for their truth.

129.    Defendants intended Aqua Dam to rely on Defendants' false representations.

130.    Defendants made the aforementioned representations to Aqua Dam to induce Aqua Dam to (a) turn a blind eye to Defendants' Initial Unauthorized Registrations and (b) enter into the Agreement while eliminating a key provision thereof which Defendants' now seek to exploit to Aqua Dam's detriment.

131.    Aqua Dam reasonably relied on Defendants false representations without knowledge of their falsity.

132.    In reliance on Defendants' false representations, Aqua Dam (a) entered into the Agreement as modified by Defendants, (b) refrained from immediately demanding that Defendants transfer and assign the Initial Unauthorized Registrations (as well as the subsequent Additional Unauthorized Registrations) to Aqua Dam, (c) continued to transact business with Defendants, including allowing Defendants to utilize the AQUA DAM Mark and Logo in connection with the distribution of Aqua Dam's Products in the Territory, and so forth.

133.     Aqua Dam would not have entered into the Agreement or taken or refrained from taking the other actions outlined above if Aqua Dam had known that Defendants' representations were false.

134.     As a direct and proximate result of Defendants' fraudulent and/or negligent misrepresentations, Aqua Dam has and continues to suffer actual, consequential, general and special compensatory damages in an amount to be determined at trial.

135.     To the extent Defendants acted fraudulently and maliciously, with an intent to harm Aqua Dam, Aqua Dam is entitled to an award of punitive damages.

## COUNT X

### (Promissory Estoppel – As To All Defendants)

136.     Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

137.     Prior to execution of the parties' Agreement, and unbeknownst to Aqua Dam, Defendants had filed for an obtained the Initial Unauthorized Registrations.  To this end, in order to induce Aqua Dam to execute and enter into the Agreement, Defendants promised Aqua Dam that (a) Defendants had filed for, obtained and were holding at least the Initial Unauthorized Registrations in trust for Aqua Dam's benefit, with all goodwill and recognition therein accruing to Aqua Dam and (b) Defendants did so to protect and preserve Aqua Dam's rights.

138.     In exchange for these promises, Aqua Dam (a) entered into the Agreement as modified by Defendants, (b) refrained from immediately demanding that Defendants transfer and assign the Initial Unauthorized Registrations (as well as the subsequent Additional Unauthorized Registrations) to Aqua Dam, (c) continued to transact business with Defendants, including allowing Defendants to utilize the AQUA DAM Mark and Logo in connection with the distribution of Aqua Dam's Products in the Territory, and so forth.

139.     Defendants should reasonably have expected their promises to have caused Aqua Dam to take certain actions or refrain from taking certain actions.

140.     With prudence and in reasonable reliance on Defendants' promises, Aqua Dam fully performed its promises through, inter alia, entering into the Agreement, refraining from demanding

COMPLAINT

the immediate assignment and transfer of the Initial and Additional Unauthorized Registrations, and continuing to do business with Defendants.

141.    On information and belief, Defendants were aware of Aqua Dam's actions or forbearance in reliance on Defendants' promises; Defendants were aware of all materials facts incident to their promises.

142.    Nevertheless, to Aqua Dam's detriment, Defendants have reneged on their promises, unilaterally refusing to transfer and assign the Initial and Additional Unauthorized Registrations to Aqua Dam and instead explicitly claiming rights therein and seeking to extort additional concessions out of Aqua Dam therefore.

143.    Aqua Dam is entitled to enforcement of Defendants' promises, particularly where Aqua Dam has already performed all of its promises.

144.    It would be inequitable and unjust to allow Defendants to avoid enforcement of their promises, particularly where Aqua Dam has suffered and will continue to suffer damages and irreparable injury as a direct and proximate result of Defendants' conduct and where Defendants have already enjoyed significant benefits resulting from the fulfillment of Aqua Dam's promises while refusing to fairly compensate Aqua Dam for the same.

145.    Aqua Dam has no adequate remedy at law and is, therefore, entitled to enforcement of Defendants' promises.

**COUNT XI**

**(Civil Extortion – As To All Defendants)**

146.    Aqua Dam restates and incorporates by reference each of the allegations set forth in the paragraphs above, as if fully set forth herein.

147.    Without cause, Defendants have refused to transfer and assign the Initial and Additional Unauthorized Registrations, instead demanding that Aqua Dam either pay a significant sum to acquire rights in the AQUA DAM Mark and Logo which already legally belong to Aqua Dam or face threats of trademark infringement here or in other foreign jurisdictions, further interference with Aqua Dam's business relations throughout the world, and challenges to Aqua Dam's trademark rights abroad.

148.     On information and belief, Defendants know that these threats, partially carried out, will cause fear and concern on Aqua Dam's part, designed to cajole Aqua Dam into paying additional and unbargained for consideration or providing concessions to Defendants for rights which already legally belong to Aqua Dam.

149.     Moreover, on information and belief, Defendants have made these threats knowing that the financial and reputational harm to Aqua Dam should Aqua Dam refuse to capitulate to Defendants' unfounded demands could be significant and irreparable so as to increase the leverage Defendants seek to exert over Aqua Dam in an effort to force Aqua Dam to pay Defendants merely to obtain rights which already belong to Aqua Dam.

150.     As a direct and proximate result of Defendants' extortionate conduct, Aqua Dam has and continues to suffer actual, consequential, general and special compensatory damages in an amount to be determined at trial.

151.     Defendants conduct as alleged herein has been malicious, fraudulent and oppressive. Defendants have acted with full knowledge and/or conscious disregard of the consequences to Aqua Dam resulting from Defendants' extortionate conduct.   Aqua Dam is entitled to an award of exemplary and punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Aqua Dam respectfully prays for judgment in favor of Aqua Dam and against Defendants, as follows:

A.       With respect to Count I, for declaratory judgment in Aqua Dam's favor that ADE is in breach of the Agreement, that Aqua Dam is not in breach of the Agreement, that Aqua Dam properly terminated the Agreement, enjoining Defendants from using the AQUA DAM Mark and Logo permanently, holding Defendants liable for the conduct complained of herein, holding that Aqua Dam has not infringed upon any rights held by Defendants, and compelling Defendants to transfer and assign at least the Initial and Additional Unauthorized Registrations (in addition to other intellectual property) to Aqua Dam;

B.       With respect to Count II, for a determination that ADE is in breach of the parties' Agreement and for entry of judgment in Aqua Dam's favor awarding actual, consequential,

1  general and special compensatory damages in an amount to be determined by the trier of fact
2  according to proof but in no event less than $327,621.20 as a result of ADE's breaches of the
3  Agreement;

4          C.        With respect to Count III, for a determination that ADE is in breach of the
5  covenant of good faith and fair dealing implied in the parties' Agreement and for entry of
6  judgment in Aqua Dam's favor awarding actual, consequential, general and special compensatory
7  damages in an amount to be determined by the trier of fact according to proof but in no event less
8  than $327,621.20 as a result of ADE's breaches of the covenant of good faith and fair dealing
9  implied the Agreement;

10          D.        With respect to Count IV, for a determination that Defendants have, individually
11  or jointly, infringed upon Aqua Dam's trademark rights in the AQUA DAM Mark under the
12  Lanham Act and/or the common law as well as the AQUA DAM Logo under common law and
13  otherwise engaged in common law unfair competition, for entry of judgment in Aqua Dam's
14  favor awarding actual, consequential, general and special compensatory damages in an amount to
15  be determined by the trier of fact as a result of Defendants' trademark infringement, and for a
16  permanent injunction prohibiting Defendants use of the AQUA DAM Mark and Logo as well as
17  any confusingly similar Speedy Dam logo(s);

18          E.        With respect to Count V, for a determination that Defendants are liable,
19  individually or jointly, for false advertising and/or false designation of origin relative to the
20  AQUA DAM Mark under the Lanham Act and/or the common law as well as the AQUA DAM
21  Logo under common law, for entry of judgment in Aqua Dam's favor awarding actual,
22  consequential, general and special compensatory damages in an amount to be determined by the
23  trier of fact as a result of Defendants' false advertising and/or false designation of origin, and for a
24  permanent injunction prohibiting Defendants use of the AQUA DAM Mark and Logo as well as
25  any confusingly similar Speedy Dam logo(s);

26          F.        With respect to Count VI, for a determination that Defendants are liable,
27  individually or jointly, for unfair competition and for entry of judgment in Aqua Dam's favor
28  awarding actual, consequential, general and special compensatory damages in an amount to be

1   determined by the trier of fact as a result of Defendants' unfair competition, including restitution,

2   disgorgement of profits, permanent injunctive relief, and exemplary or punitive damages;

3         G.      With respect to Count VII, for a determination that Defendants are liable,

4   individually or jointly, for tortious interference with Aqua Dam's business relationships and

5   expectancies and for entry of judgment in Aqua Dam's favor awarding actual, consequential,

6   general and special compensatory damages in an amount to be determined by the trier of fact as a

7   result of Defendants' tortious interference;

8         H.      With respect to Count VIII, for a determination that Defendants, individually or

9   jointly, have been unjustly enriched as a result of their conduct for entry of judgment in Aqua

10  Dam's favor awarding Aqua Dam for the fair value of the benefits Aqua Dam has bestowed upon

11  Defendants;

12        I.      With respect to Count IX, for a determination that Defendants fraudulently or

13  through negligent misrepresentations induced Aqua Dam to enter into the Agreement and for

14  entry of judgment in Aqua Dam's favor awarding actual, consequential, general and special

15  compensatory damages in an amount to be determined by the trier of fact as a result of

16  Defendants' improper inducement of the Agreement;

17        J.      With respect to Count X, for a determination that Defendants, individually or

18  jointly, are estopped from reneging on promises made to Aqua Dam and for entry of judgment in

19  Aqua Dam's favor compelling Defendants to transfer and assign the Initial and Additional

20  Unauthorized Registrations (in addition to other intellectual property) to Aqua Dam;

21        K.      With respect to Count XI, for a determination that Defendants, individually or

22  jointly, are liable for civil extortion and for entry of judgment in Aqua Dam's favor awarding

23  actual, consequential, general and special compensatory damages in an amount to be determined

24  by the trier of fact as a result of Defendants' extortionate conduct;

25        L.      For costs incurred in bringing this action, including attorneys' fees and other

26  expenses of litigation;

27        M.      For injunctive relief in connection with and/or in addition to any award of

28  damages, including treble damages under the Lanham Act; and

N.     For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

Aqua Dam hereby demands a jury trial on all issues and claims properly triable to a jury.


DATED:  March 19, 2021                    BROWNE GEORGE ROSS
                                         O'BRIEN ANNAGUEY & ELLIS LLP
                                            Keith J. Wesley
                                            Joachim B. Steinberg

                                         KIRTON McCONKIE
                                            James T. Burton
                                            Joshua S. Rupp


                                         By: _____
                                                Keith J. Wesley
                                         Attorneys for Plaintiffs
                                         Aqua Dam, Inc. and Water Structures Unlimited, LLC

EXHIBIT A

# DISTRIBUTOR AGREEMENT BETWEEN AQUA DAM, INC. AND ALBION WATER STRUCTURES, LIMITED

AQUA DAM, INC. hereinafter referred to as the "Company," and ALBION WATER STRUCTURES, LIMITED, hereinafter referred to as the "Distributor," in consideration of the promises made herein and intending to be legally bound, agree as follows:

## ARTICLE 1. RECITALS

### Effective Date of Agreement

Section 1.01.   The Effective date ("Effective Date") of this Distributor Agreement ("Agreement") shall be the last date that this Agreement is executed by the parties hereto, as identified in the signature portion of this Agreement.

### Legal Status of Company

Section 1.02.   The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of California, with corporate power to own property and carry on its business as it is now being conducted.  The Company has its principal office and place of business at 121 Main Street (P.O. Box 144) Scotia, California, USA, 95565.

### Status of Distributor

Section 1.03.   The Distributor is a Company duly organized, validly existing, and in good standing under the laws of the country of England (No. 6907247), with corporate power to own property and carry on its business as contemplated by this agreement.  The Distributor has its registered office, which is its principal office and place of business at  Regus Building, Windmill Hill Business Park, Whitehill Way, Swindon, SN5 6QR, England.

### Purpose

Section 1.04.   The purpose of this Agreement is to appoint an overseas distributor for certain of the Company's Products ("Products"). It is agreed by both parties that a primary business objective of this Agreement is to develop a network of established business people as Products representatives in each of the territory countries where this is a commercially feasible and profitable proposition.

## ARTICLE 2. DISTRIBUTORSHIP

### Exclusive Appointment

Section 2.01.   The Company appoints the Distributor as its exclusive distributor with authority to sell, either wholesale or retail, certain of the Company's products (specifically, Aqua Dam's), in the following European Union countries:  Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia,

Distributorship Agreement Between Aqua Dam, Inc. & Albion Water Structures, Ltd.

Page 1 of 8

Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, United Kingdom,  (collectively, the "Territory").

### Best Efforts

Section 2.02.   In consideration of this appointment, the Distributor shall exert its best efforts to promote the sale of the Products.

### Limitations on Conduct of Distributor

Section 2.03.   The Distributor shall not manufacture goods which compete with the Products; actively advertise or solicit orders, establish branches or maintain distribution facilities for the Products outside the Territory; purchase or otherwise acquire the Products for resale from any person, firm or company other than the Company. However, with prior written agreement from the Company the Distributor may solicit orders outside the Territory.

### Limitations on Conduct of Company

Section 2.04.   The Company shall not appoint any other person, firm or company as a distributor for the Products, within the Territory, during the Term of this Agreement, as hereafter defined; or supply the Products, whether for use or resale, to any person, firm or company in the Territory, other than the Distributor, for the duration of the Term of this Agreement, and further agrees to refer to the Distributor all requests received by the Company from existing or potential customers within the Territory relating to the supply of the Products within the Territory during the Term of this Agreement.

### Prices and Discounts

Section 2.05.   The Company, or other sources which the Company approves, will sell the Products to the Distributor at regular prices and discounts quoted in price lists issued from time to time.  The price list attached hereto as "Exhibit B" is currently in effect, and shall apply until further notice.

### Selling Rights Reserved

Section 2.06.   The Company reserves the right, either directly or through its distributors, agents or assigns, to sell any of its Products to any individual, governmental entity, or nongovernmental entity, whose principal place of business lies outside of the Territory, or for whose intended end use of the Products, as disclosed by the potential purchaser to the Company, lies outside of the Territory.

### Acceptance

Section 2.07.   The Distributor accepts the appointment to development demand and to sell the Products within the Territory and will make all sales hereunder in accordance with the terms of this Agreement.

## Term

Section 2.08.   The Term of this Agreement shall commence upon the Effective Date of the Agreement, and shall bind the parties hereto for a period of ten (10) years thereafter, subject to the following provisions:

(8.1)   Subject to all of the remaining provisions set forth below, either party shall have the right, exercisable by giving not less than twelve (12) months' written notice to the other party, at any time prior to the expiration of the initial ten (10) year Term described above, or any further period for which this Agreement has been extended pursuant to this provision, to extend the Term of this Agreement for an additional ten (10) year period.

(8.2)   On an annual basis, the Company shall evaluate the success of Distributor's efforts to organize a network of physical distribution locations within the Territory (to receive, store and distribute the Products within the Territory), as well as all other aspects of the performance of the Distributor with respect to the subject matter of this Agreement.  Such evaluation and all determinations following same shall be in the Company's sole and absolute discretion.  In the event the Company determines that the Distributor's performance is not satisfactory to the Company, the Company shall provide the Distributor with one hundred eighty (180) days' written notice, sent by registered mail to Distributor at the address set out above, with such notice to be complete upon mailing, providing a specific description of the unsatisfactory performance and a specific description of those actions necessary to cure the unsatisfactory performance.  In the event that the unsatisfactory performance, in the sole and absolute discretion of the Company, is not cured within said one hundred eighty (180) days, the Company shall have the option, in the Company's sole and absolute discretion, to terminate the Agreement without further notice.

(8.3)   Either party may terminate this Agreement by giving ninety (90) days written notice sent by registered mail to the other at the address set out above, with such notice to be complete upon mailing, for any of the following reasons:

a.   If any sum owing to that party by the other party under any of the provisions of this Agreement is not paid within one hundred twenty (120) days of the due date for payment;

   b. If the other party commits any other breach of any of the provisions of this Agreement and, if the breach is capable of being cured, fails to cure the breach within with one hundred eighty (180) days' after being given written notice providing a specific description of the breach and a specific description of those actions necessary to cure said breach;

   c. If the other party files a Petition for Bankruptcy, or otherwise ceases, or threatens to cease, to carry on its business.

### Right of Company to Cancel

Section 2.09. In case of insolvency of the Distributor, or in case an application is made to have the Distributor declared bankrupt, or in case a receiver or trustee is appointed for the Distributor, then the Company, may, in its sole and absolute discretion, cancel this Agreement by giving ninety (90) days written notice .

### Applicability of Terms After Termination

Section 2.10. In the event of termination, this Agreement shall remain applicable to any orders for Products which the Distributor has previously placed and to any other orders which may be executed prior to the effective date of the termination.

### ARTICLE 3. OPERATIONS

### Acceptance of Orders; Filling

Section 3.01. All orders the Company receives for the Products from the Distributor are subject to acceptance by the Company, in the Company's sole and absolute discretion. The Company will use its best efforts to fill the accepted orders are promptly as practicable, subject, however, to delays caused by government orders or requirements, transportation conditions, labor or material shortages, strikes, riots, fires, or any other cause beyond the Company's control. In all cases, the Company will use its best efforts to advise the Distributor in advance of any inability to make full and timely delivery of the Products which the Distributor has previously ordered.

### Payment

Section 3.02. The Distributor shall pay the Company for the Products the Distributor's net prices, FOB/FCA Shipping Point (e.g. Scotia, California, U.S.A.) according to the Schedule of Prices described in Section 2.0.5. of this Agreement. The Company may change the Schedule of Prices at any time without notice. The Distributor shall pay the Company for the Products on any of the following terms: cash or cash equivalent at time of collection of the Products from the Manufacturer;

*(insert any other acceptable terms of payment)*

---

### Right to Use Name

Section 3.03.   Removed

### Audits of Books

Section 3.04.   The Distributor shall have his books reviewed at least annually by a competent accountant or auditor and shall furnish a certified copy of such review to the Company for its permanent record.

### Warranty

Section 3.05.   The Products sold under this Agreement are purchased by Distributor **"AS IS" THE COMPANY DOES NOT WARRANT THAT THEY ARE OF MERCHANTABLE QUALITY OR THAT THEY CAN BE USED FOR ANY PARTICULAR PURPOSE.** No express or implied warranties are given and no affirmation of the Company, by words or action, will constitute a warranty. **THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PRODUCTS IS WITH THE DISTRIBUTOR.  SHOULD THE PRODUCTS PROVE DEFECTIVE FOLLOWING THEIR PURCHASE, THE DISTRIBUTOR, AND NOT THE COMPANY, ASSUMES THE ENTIRE RISK AND COST OF ALL NECESSARY SERVICING OR REPAIR.**

The Company shall in no event be liable to the Distributor or to any eventual buyer of the Products, for any direct or indirect damages suffered as the result of any alleged defects in the Products, uses of the Products, misuses of the Products, failures of the Products, or otherwise, without limitation.

It is the intent of the Parties to provide in this Agreement an effective disclaimer of all express and implied warranties with respect to the Products sold under this Agreement.  Both Parties are represented by competent counsel and have reduced the entire Agreement of the Parties to this writing.  No statement of fact, promise, representation, affirmation or other indication has been made with respect to the quality of the Products other than those which appear in this written Agreement.  The description of the Products contained in this Agreement is the sole basis for the Agreement of the Parties, and no statements or representations other than those embodied herein have been made or relied on.  Any sample, model, prior course of dealings between the Parties, verbal statements, or information contained on the Company's website was not and is not intended as a basis for this Agreement, and the Distributor acknowledges that same was used for the purposes, in relevant part, of approximate illustration only, and that no reliance was placed on same in arriving at the Terms of this Agreement.  It is agreed that any opinions or statements of the Company as to the value or quality of the Products sold under this Agreement, whether verbal or written, do not form a basis of this Agreement, and such statements or opinions  do not, in any way constitute an express or implied warranty.  Any

modification of this Agreement that relates in any way to a warranty must be in writing and signed by the Company; otherwise the purported modification shall be null and void.

The only exception to the above is that the Company does warrant that the Products which it sells to the Distributor shall be free from significant defects in workmanship or materials at the time said Products are shipped from the Company's Scotia, California, USA facility. In the event that it is demonstrated, to the satisfaction of the Company, that any such defective Products were sold to the Distributor, the Distributor shall be entitled to, as its sole and only remedy, to, in the Company's sole and absolute discretion, either a refund of the purchase price only, or to the replacement of the defective Product, with shipping of same FOB/FCA Shipping Point (e.g. Scotia, California, U.S.A.) In the event of a replacement, the Company shall not be liable for any direct or indirect damages whatsoever, to any degree.

### Insurance

Section 3.06. The Distributor shall provide and maintain, and shall require each subcontractor (regardless of tier), at their sole cost and expense, to provide and maintain, in effect during the sale or installation of any Products sold to the Distributor under the Terms of this Agreement, minimum liability insurance coverage with carriers authorized to conduct business in the country in which the Products are sold or installed, in a form that is the equivalent of commercial general liability insurance, to include products liability coverage, (with coverage consistent with ISO Form CG00 01 12 07 or its equivalent) with a limit of not less than one million dollars ($1,000,000) per occurrence and per project or per location aggregate, covering liability for bodily injury (including claims against the Distributor or the Company) and property damage, arising from premises, operations, independent contractors, personal injury, blanket contractual liability, and products/completed operations liability. The Company shall be identified as a named insured on said policy. The Distributor shall be responsible for all premiums, any deductibles or self-insured retentions applicable, and any and all other costs associated therewith. Upon written request, the Distributor shall provide the Company with proof of insurance as identified in this section, within fifteen (15) days of the mailing of said notice by the Company to Distributor, via certified mail.

### Primary Business Objective

Section 3.07. It is agreed by both parties that a primary business objective of this Agreement is to develop a network of established business people as Products representatives in each of the territory countries where this is a commercially feasible and profitable proposition.

## ARTICLE 4. INTERPRETATION AND ENFORCEMENT

### Notices

Section 4.01. Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given when deposited in the United States

mail, postage prepaid, or when deposited with a public telegraph company for transmittal, charges prepaid, addressed:

(a) In the case of the Company, to AQUA DAM, INC., Attention: Matthew Wennerholm, P.O. Box 144, Scotia, California, USA, 95565, or to such other person or address as the Company may from time to time furnish to the Distributor.

(b) In the case of the Distributor, to ALBION WATER STRUCTURES, LIMITED, Attention: The Managing Director, Regus Building, Windmill Hill Business Park, Whitehill Way, Swindon, SN5 6QR, England, or to such other person or address as the Distributor may from time to time furnish to the Company.

### Distributor Not Agent or Legal Representative; No Joint Venture

Section 4.02.   This Agreement does not constitute the Distributor the agent or legal representative of the Company for any purpose whatsoever.  The Distributor is not granted any right or authority to assume or to create any obligation or responsibility, express or implied, in behalf of or in the name of the Company or to behind the Company in any manner.   The parties specifically agree that they do not intend to enter into a joint venture or employer/employee relationship.

### Completeness of Instrument

Section 4.03.   This instrument contains all of the agreements, understandings, representations, conditions, warranties, and covenants made between the parties hereto.  Unless set forth herein, neither party shall be liable for any representations made, and all modifications and amendments hereto must be in writing.

### Assignment

Section 4.04.   The Distributor shall not transfer or assign the Agreement or any part thereof without written consent of the Company. This consent not to be unreasonably withheld.

### No Implied Waivers

Section 4.05.   The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the full right to require such performance at any time thereafter.  Nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

### Controlling Law

Section 4.06.   The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the State of California, U.S.A.  It is understood, however, that this is a general form of agreement, designated for use between the Company, who is headquartered in the United States of America, and the Distributor, who is headquartered in the

Distributorship Agreement Between Aqua Dam, Inc. & Albion Water Structures, Ltd.

Page 7 of 8   QMb

United Kingdom.  The parties agree that any and all disputes that may arise concerning the subject matter of this Agreement, that are not otherwise resolved without litigation,  shall be litigated in the State Courts of the State of California, with venue in the County of Humboldt, and/or in the United States District Court, Northern District of California.

Executed on ___1/30/2013___ at _Scotia   California   USA_.
                Date           City    State       Country

COMPANY

AQUA DAM, INC.

By: _Matthew Wennerholm_____

Matthew Wennerholm, Vice President

Executed on ___04 February 2013___ at _Marlborough  Wiltshire  England_
                Date           Town    County      Country

DISTRIBUTOR

ALBION WATER SYSTEMS, LIMITED

By: _Gregory Shakeshaft_____

Gregory Shakeshaft, Director

8 of 8